Isadore Bookstein, J.
In Brown v. Board of Educ. (347 U. S. 483 [1954]) the United States Supreme Court declared that segregation of races in public schools pursuant to State laws, i.e., de jure segregation, violates the Fourteenth Amendment of the United States Constitution.
More than half a century before that decision, New York State had abolished de jure segregation in the public schools.
*202 Article 11 of chapter 556 of the Laws of 1894 authorized school districts to establish and maintain separate schools for Negro children resident therein but with the same facilities for instruction as the white schools therein, a classic example of de jure segregation, i.e., segregation by law.
Six years later, chapter 492 of the Laws of 1900 repealed section 28 of article 11 of chapter 556 of the Laws of 1894 and provided that: “No person shall be refused admission into or be excluded from any public school in the State of New York on account of race or color.”
The 1900 enactment was the forerunner of section 3201 of the Education Law which provides that: “No person shall be refused admission into or be excluded from any public school in the state of New York on account of race, creed, color or national origin.”
Thus, for more than 60 years, de jure segregation in the public schools of this State has been barred by law. Education Law (§ 313, subd. [1], subd. [3], par. [a]) dealing with post-secondary grade educational institutions, declares it to be an unfair practice to exclude or limit or otherwise discriminate against any person seeking admission because of race, religion, creed, color or national origin.
Union Free School District No. 12 of the Town of Hempstead, which appears to be known also as the Malverne-Lakeview School District, State of New York, lies partially within the Villages of Málveme and Lynbrook, and unincorporated areas of the Town of Hempstead. The district contains three elementary schools: Woodfield Road School, Davison Avenue School and Linden Place School.
In accordance with long-established practice in this State, where there is more than one elementary school in a school district, attendance areas or zones are laid out by the school board, and pupils are required to attend the school located in their attendance area. The geographical boundaries of these attendance areas are drawn with many factors in mind, such •is safety, traffic conditions, proximity to the homes of pupils, etc. They were not drawn in the instant case with a view to producing segregated schools, i.e., schools predominantly for white pupils or schools predominantly for Negro pupils. Race, color or creed were not factors in drawing attendance area lines.
The attendance area of the Woodfield Road School has had a substantial increase in Negro residents; as a natural consequence, there is a large attendance of Negro pupils at that school. The present ratio of Negro to white pupils in the Woodfield Road School is 75%.
*203 Circumstances have produced what is termed “ racial imbalance ”. The Advisory Committee appointed by respondent Commissioner of Education (herein called “ Commissioner”) declared this to be de facto segregation. It is not claimed to be de jure segregation, or segregation purposely caused by public officers.
Indeed, that committee, in its report to the Commissioner said: “If racial differences were not a fact of life in this community, the attendance areas as defined could be cited as an excellent example of administrative planning. They are of suitable size, as compact as possible, and place the majority of children within convenient walking distance of their schools. * * * The actions of the Board could not be termed arbitrary. In 1961 in response to the community situation, the Board transferred students from Woodfield Road to the other two schools. This was done to equalize class size and to utilize all buildings most effectively.”
Such transfers were not made on any basis of race, color or creed.
However, the Commissioner contended that the situation nevertheless constitutes de facto segregation, and he determined that a ‘1 racially imbalanced ’ ’ school is ‘ ‘ one having 50 percent or more negro pupils enrolled.”
Thereafter, on application of certain pupils from Woodfield Road School, the Commissioner ordered the respondent, Board of Education (herein called “Board”) to redraw attendance area lines so as to eliminate “ racial imbalance ”. In effect, he ordered a gerrymandering of the attendance area zones, for the purpose of eliminating ‘ ‘ racial imbalance ’ ’.
The Commissioner’s direction to the district’s school board was to “ reorganize the attendance areas of the District so that all pupils from the kindergarten to grade 3 inclusive will attend either the Davison Avenue or the Linden Place elementary school; all pupils in grades 4 or 5 will attend the Woodfield Road School.”
The Board’s plan, following the aforesaid direction, required that 224 pupils from Woodfield Road School, selected on the basis that they are of the Negro race, be transferred to the Davison Avenue and Linden Place Schools; 92 pupils from Davison Avenue School, selected on the basis that they are not of the Negro race, be transferred to the Woodfield Road School; and 82 pupils from Linden Place School, selected on the basis that they are not of the Negro race, be transferred to Woodfield Road School.
*204 At the threshold, petitioners are met with motions to dismiss on the ground that they fail to state a cause of action, and the determination of the Commissioner is final and not subject to judicial review.
Section 310 of the Education Law does preclude judicial review and does render a decision of the Commissioner final in enumerated respects, which are, indeed, the vast majority of matters regulating internal educational details entrusted to administration by the Commissioner. There are, however, some exceptions to the finality of his determinations and the preclusion of judicial review.
As said in Matter of Board of Educ. v. Allen (6 A D 2d 316, 321): “It is a common thing for the court to look at the statutory authority and also at what the administrator has done to see whether he has kept within the frame of his powers.” (See, also, Matter of Ross v. Wilson, 308 N. Y. 605; Matter of Fabricius v. Graves, 254 App. Div. 19; Matter of Ellis v. Allen, 4 A D 2d 343; Matter of Board of Educ. v. Allen, 32 Misc 2d 381.)
Here petitioners assert that Commissioner’s action violates section 313 and 3201 of the Education Law; section 11 of article I of the New York Constitution and section 1 of the Fourteenth Amendment to the United States Constitution. If so, it is subject to judicial intervention.
The Commissioner’s determination in this case is quite at war with his determination rendered in July, 1956, after the United States Supreme Court decision in the Brown case (77 N. Y. St. Dept. Rep. 37).
There, although it was asserted that pupil attendance in one of the schools in an attendance area would be 80% Negro, the Commissioner, denying relief, said (pp. 38-39): “ Because of the incidence of location, the mere fact that the preponderance of the children who would normally attend the neighborhood school happened to be white or negro, of Polish, Irish, Scotch, Swedish, Italian or English descent or otherwise or who espouse one religion or another, does not require a board to attempt to gerrymander the lines, to assign but a certain percentage to a particular school. This would constitute as much discrimination as a gerrymandered line to accomplish the opposite effect. The safety of the children, both white and negro, is certainly a greater consideration than the claim made by these appellants that because there is a substantial predominance of Negroes in the Northeast School, that this will mitigate against their educational program. * * *
“ I reiterate what has been said by my predecessors in office; there can be no race, creed or national origin discrimination *205 permitted in the public school system. However, upon the facts present in this case as heretofore outlined, no discrimination is shown.”
In Taylor v. Board of Educ. of City School Dist. (191 F. Supp. 181 [S. D. N. Y., 1961], affd. 294 F. 2d 36 [C. C. A. 2d, 1961]) the District Court, having found that the board had gerrymandered district lines for the express purpose of accomplishing segregation and confining Negro children to an all-Negro populated school, held that its conduct was violative of the constitutional rights of the Negro school children under the decision in Brown v. Board of Educ. (347 U. S. 483 [1934]). In the Taylor case, de facto segregation was no longer de facto but became de jure segregation by deliberate acts of school officials.
The case of Branche v. Board of Educ. of Town of Hempstead (204 F. Supp. 150 [E. D. N. Y., 1962]) was decided on a question of pleading. It denied the motion of defendant for summary judgment on the ground, that the complaint alleged that the segregation complained of was due to State action.
It is true that in that case, the court, in its opinion (p. 153) said: “ The educational system that is thus compulsory and publicly afforded must deal with the inadequacy arising from adventitious segregation; it cannot accept and indurate segregation on the ground that it is not coerced or planned but accepted.”
In Bell v. School City of Gary, Indiana (213 F. Supp. 819 [N. D. Ind., 1963]) the District Court held that a school system developed on the neighborhood school plan, honestly and conscientiously constructed with no intention or purpose to segregate races, need not be destroyed or abandoned because a resulting effect is racial imbalance in certain schools by reason of population concentration where districts are populated almost entirely by Negroes or whites, and that racial balance in public schools is not constitutionally mandated. In other words, while the United States Constitution forbids segregation by law in the public schools, it neither forbids racial imbalance nor compels racial balance.
The Bell case is the only one to which my attention has been called or which has been found in independent research, treating with almost the precise situation presented here. Moreover, in that case, there does not appear to have been any Indiana statute similar to section 3201 of the New York Education Law.
Nor has any decision by the courts of this State on the precise problem posed apparently been made.
*206 The Constitution forbids segregation by law in the public schools. It does not, however, prohibit racial imbalance; nor does it mandate racial balance.
Upon these applications, these facts are undisputed; racial imbalance exists in the three neighborhood schools involved; such racial imbalance does not result from law but rather from incidence of residence; and there has been nothing improper in the drawing of lines for attendance zones.
The contention of the Commissioner, however, is that racial imbalance is harmful to education; and for that reason, and that reason alone, he has made the order under attack in these proceedings.
The question here presented is whether the Commissioner has the power to abolish that concept, under the law as it now exists.
Section 3201 is clear and unmistakable. It says: “No person shall be refused admission into or be excluded from any public school in the state of New York on account of race, creed, color or national origin.”
When a number or percentage of pupils of whatever race, color or creed, normally entitled and indeed required to attend a public school in their attendance zone, are denied admission, and, contrary to their wishes, are directed to attend a school in a different zone in order to eliminate racial imbalance, is this anything other than denial of admission on the ground of race or color, contrary to long-established law? Irrespective of whether the pupils be white or Negro, it would certainly seem that admission on such a basis is predicated on race or color. Admission so predicated, even though intended to alter racial imbalance, nonetheless violates the language of the statute.
This court is constrained to find that section 3201 of the Education Law precludes the Commissioner from making the determination which he did.
Accordingly, the motions to dismiss the petitions are denied, and the determination of the Commissioner is annulled.